FILED
U. S. DISTRICT COURT
DISTRICT OF NEBRASKA

**IN THE UNITED STATES DISTRICT COURT** 15 JUN 11  PM 2: 30
**FOR THE DISTRICT OF NORTH DAKOTA**
OFFICE OF THE CLERK

Civil Action No.:

|  |  |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| NORTH DAKOTA DEVELOPMENTS, LLC,<br>ROBERT L. GAVIN, and<br>DANIEL J. HOGAN, | )<br>)<br>)<br>) |
| Defendants, | )<br>) |
| and | )<br>) |
| NORTH DAKOTA DEVELOPMENTS<br>PROPERTY MANAGEMENT LLC,<br>GREAT AMERICAN LODGE LLC,<br>NDD HOLDINGS 1 LLC,<br>NDD HOLDINGS 2 LLC,<br>NDD MODULAR LLC,<br>AUGUSTA EXPLORATION, LLC,<br>AMES ENGINEERING & DEVELOPMENT<br>SERVICES LLC, and | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Relief Defendants. | )<br>) |

**COMPLAINT**

8: 15-mc - 00069

As its Complaint, Plaintiff Securities and Exchange Commission alleges as follows:

## SUMMARY

1.     This matter concerns an offering fraud and Ponzi scheme conducted by North

Dakota Developments, LLC ("NDD") and its owners Robert L. Gavin and Daniel J. Hogan.

Since May 2012, Defendants have fraudulently raised over $62 million from hundreds of

investors in various states in the U.S. and foreign countries through the sale of interests in the

development of short-term housing or "man camps" for workers in the Bakken oil field region of North Dakota and Montana. Defendants sold these interests in four NDD projects – Watford West, Montana, Watford East, and Transhudson. Watford West, the first project, was sold in three phases, with the first phase beginning in May, 2012. Defendants began selling the second and third phases of Watford West in November, 2012, and April, 2013. Defendants sold interests in the Montana project beginning in August 2013, interests in Watford East beginning in February, 2014, and Transhudson beginning in June 2014. Defendants are still selling interests in some of the projects.

2.      The interest sold to investors by defendants were marketed as purchases of "units" in real estate developments, but the interests were managed collectively along with other investors' interests and were securities under the federal securities laws.

3.      Defendants, in written offering materials and through commissioned agents, represented to potential investors that investment in these man camp projects would provide exceptionally high annual returns, up to 42%, in the first year of the project. In addition, Defendants offered investors the option of receiving a "guaranteed" or "assured" annual return of up to 25% of the purchase price of their unit, without regard to actual rental income. As further inducement to invest, Defendants also promised investors that the various man camp projects would be operational in a very short time frame, often within months.

4.      In reality, NDD, Gavin, and Hogan each knew that at least by late 2013 NDD's first man camp project was significantly delayed and occupancy was low and that the remaining projects were delayed or not yet begun. As a result, Defendants promised returns were unreasonable after that time. Moreover, even at the present time, none of the projects is fully

operational and one of the projects offered does not even have governmental approval for construction to begin.

5.      The only partially operational project, referred to as "Watford West," has operated at a loss.  However, despite Watford West's lack of profits, Defendants have made Ponzi-style payments to investors in Watford West by paying investors "guaranteed returns" in the Watford West project using funds from investors in later NDD projects.  Defendants have not paid any returns to investors in the other projects.

6.      In addition, instead of developing the man camp projects as promised, Defendants misappropriated over $25 million of investor funds.  NDD used these funds to pay undisclosed commissions to brokers, make payments to Hogan and Gavin, make investments in unrelated Bakken projects for Hogan and Gavin's personal benefit, and make the Ponzi-like payments discussed above.

7.      As part of the scheme, Defendants made material misrepresentations and omissions regarding the use of investor funds, the payment of commissions, and the return on the investment, directly to investors and indirectly to investors through agents they provided marketing materials and paid commissions.

8.      As a result of the conduct described in this Complaint, Defendants directly or indirectly engaged in transactions, acts, practices, or courses of business that constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15. U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]. Unless Defendants are restrained and enjoined, they will continue to engage in the transactions, acts, practices, and courses of business set forth in this Complaint, and will continue to violate of

Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act and Section 27(a) of the Exchange Act.  NDD resides within this district and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of North Dakota.

11.     In addition, the Court has personal jurisdiction over Defendants Gavin and Hogan because they traveled to this district, and conducted, and directed business through and on behalf of NDD in this district.

## DEFENDANTS AND RELATED ENTITIES

12.     **North Dakota Developments, LLC** is a Delaware limited liability company registered to do business in North Dakota with the North Dakota Secretary of State and maintaining a place of business in Williston, North Dakota.  NDD is a purported Bakken-area real estate developer.  Gavin owns 80 percent of NDD, and Hogan owns 20 percent.  NDD has never registered an offering of securities under the Securities Act or a class of securities under the Exchange Act.  NDD has never been registered with the Commission in any capacity.

4

13.     **Robert L. Gavin** ("Gavin") is a resident of Kuala Lumpur, Malaysia. Gavin is a

managing member, along with Hogan, of NDD and serves as NDD's Chief Executive Officer

("CEO"). As majority owner, managing member, and CEO of NDD, Gavin exercised control

over the management, general operations, and policies of NDD, as well as certain of the

activities upon which NDD's violations are based. In 2012 and 2013, Gavin traveled to North

Dakota on behalf of NDD to establish NDD's operations. Gavin directs NDD's activities in

North Dakota by the use of email and telephone calls made to NDD employees in North Dakota.

In addition, Gavin has a home in Florida. Gavin also directly interacted with a U.S.-based agent

hired to promote NDD's securities, and drafted, reviewed, and approved materials used to solicit

U.S. and foreign investors in NDD projects. Gavin is an authorized signatory on NDD's U.S.

bank accounts, directed Hogan to use investor funds to make payments from those accounts, and

exercised ultimate authority over those bank accounts. Gavin also obtained compensation from

NDD out of investor funds and authorized the misuse of investor funds, including executing

various contracts that constituted the misappropriation of investor assets.

14.     **Daniel J. Hogan** ("Hogan") is a resident of the United Kingdom. Hogan is a

managing member, along with Gavin, of NDD and serves as NDD's Chief Operating Officer

("COO"). As owner, managing member, and COO of NDD, Hogan exercised control over the

management, general operations, and policies of NDD, as well as certain of the activities upon

which NDD's violations are based. Hogan participated in in-person meetings in the United

States with 15-20 investors, potential investors, and/or agents in NDD projects, provided training

to NDD's sales agents, reviewed and approved materials used to solicit investors in NDD

projects, and exercised authority over NDD's bank accounts and use of investor funds. Hogan

also obtained compensation from NDD out of investor funds. Since 2013, Hogan has spent

5

approximately 75 percent of his time in North Dakota transacting business for himself and NDD. Hogan maintains personal bank accounts at financial institutions located in North Dakota.

15.     **Relief Defendants.** Defendants created various U.S. entities through which they engaged in their scheme and transferred misappropriated assets and funds, including, but not limited to, North Dakota Developments Property Management, Great American Lodge, NDD Holdings 1, NDD Holdings 2, NDD Modular, and Ames Engineering & Development Services. Each of the foregoing entities are limited liability companies organized in North Dakota or authorized to do business in North Dakota and with a place of business in North Dakota. Defendants also transferred some investor funds to Augusta Exploration, LLC, a Montana limited liability company maintaining an office in Whitefish, Montana.  Defendants exercised control over the management, general operations, and policies of each entity identified in this paragraph.

## FACTS

### *NDD's Offerings*

16.     From approximately May 2012 through the present, NDD raised over $62 million from hundreds of investors in over a dozen states in the United States and several other countries, including the United Kingdom, France, Spain, and Australia.

17.     NDD obtained these funds by offering individuals the opportunity to invest in four temporary housing projects in the Bakken oil field region of North Dakota and Montana:

•       Watford West – a man camp using modular housing units on State Road 85 in Arnegard, North Dakota;

•       Montana – a man camp using modular housing units in Culbertson, Montana;

6

- Watford East – a proposed man camp using modular housing units east of Watford City, North Dakota on Route 23; and

- Transhudson Hotel – a proposed hotel development also using modular construction on Route 23 in Parshall, North Dakota.

18.    Watford West, the first project, was sold in three phases, with the first phase beginning in May, 2012.  Defendants began selling the second and third phases of Watford West in November, 2012, and April, 2013. NDD sold interests in the Montana project beginning in August 2013, interests in Watford East beginning in February, 2014, and in Transhudson beginning in June 2014.  NDD is still selling interests in some of the projects.

19.    NDD marketed these projects through a website (nddgroup.com), print and online advertisements, email blasts, in-person meetings and seminars, conference calls, and flyers. NDD marketed the projects directly and through the use of agents who were paid commissions. The primary and standard marketing documents NDD used to solicit investors were offering materials in the form of "flyers" – colorful, glossy documents ranging from 10-20 pages that were distributed by email or available for download online.  The flyers were project specific and separate flyers were used for each of the projects.  The flyers were drafted, reviewed, and/or approved by Hogan and Gavin.

20.    Although each of the projects was in a different location and marketed separately, the investment structure and the benefits to investors were presented in substantially similar fashion.  Investors bought "units" in NDD's projects motivated by the potential returns that NDD would provide from jointly managing all of the units in a fully-developed "man camp," complete with amenities typically found in a hotel or motel.

21.     The Watford West brochure projected first year investor income of 36% to 42% and average investor income over ten years of 48% to 56%. Later on, defendants continued to tout its "massive" annual returns from the Watford project, but also offered investors the option of a 23.5% guaranteed annual return for investment in the Watford West project.

22.     Similarly, the Montana brochure projected first year investor income of 33% to 39% and average investor income over ten years of 46% to 55%. The Watford East brochure projected first year investor income of approximately 33%. In the Transhudson brochure, defendants promised investors a 20% guaranteed return, with a guaranteed buy-back of the investment after three years at the purchase price plus 10%.

23.     The Montana, Watford East, and Transhudson brochures each touted NDD "success" with the Watford West project. They highlighted NDD's rapid completion of the project and promised high occupancy and high rental rates to investors.

24.     While NDD marketed their investments as purchases of "units" in real estate developments, as explained further below, the investments were in fact securities under the federal securities laws.

25.     Although according to NDD investor "units" represented a fractional interest in a modular housing unit at one of the four sites developed by NDD, investors were never provided with a title or deed to the property evidencing their ownership. The purchase price for the units varied, but typically ranged from $50,000 to $90,000, in addition to a "booking fee" paid directly to NDD.

26.     Investors agreed to transfer their investments in the man camp projects to an escrow agent in the United States. The marketing flyers stated that the funds would only be released to NDD in stages: 35 percent immediately; 35 percent when the unit was "ready to ship

8

from the factory"; and the final 30 percent when unit was placed on the site and "ready for.
occupation." NDD represented to investors in marketing flyers that the escrow account process
would add layer of security to the investment and ensure that funds were only released to NDD
after it reached a project milestone.

27.     At the same time as investors agreed to make their investment, they also executed
a management agreement with NDD. NDD's collective management of the units as an
integrated man camp was an essential element of the investment. NDD "strongly
recommend[ed]" that investors select NDD to manage the unit and created material restrictions
on investors choosing to manage their own units. NDD required investors to pay a punitive
"lease" payment to NDD, ostensibly for leasing the ground under their unit, of $24,000 per year;
a fee that NDD waived if NDD managed the unit. Not surprisingly, every investor agreed to
have NDD manage their units.

28.     Under the management agreement, NDD agreed to pay either a fixed return'to
investors of up to 25 percent per year based on the purchase price of the unit – which NDD
touted as "guaranteed" or "assured" – or a variable rate of return based on half of the gross rents
collected by NDD. In marketing materials, NDD agreed to pay so-called "guaranteed" returns
"regardless of the actual rental income received, whether higher or lower than the actual income
derived from" investor units.

29.     Investors agreeing to variable returns based on rental income expected to
participate in profit-sharing or rental pooling. In the Watford West project, NDD has pooled the
rental income among all units and paid it out to investors, pro rata. For the Montana and
Watford East projects, NDD agreed to manage all of the units on the site collectively so that all
units were rented for approximately the same number of nights at similar rates. The

Transhudson project provided only an "assured" return of 20%, unrelated to actual unit rental occupancy or rental rates.

### *NDD's Offering Materials Promised Exceptional Investment Returns*

30.     NDD enticed investors with remarkable claims regarding potential investment returns. These claims featured prominently and repeatedly on the marketing materials which were drafted, reviewed, and/or approved by Hogan and Gavin. For example, the first page of a Watford West flyer reads:

## UP TO 42% ANNUAL RENTAL YIELDS

✓ Fully serviced workforce accommodation
✓ Up to 42% rental yield in year 1
✓ Average annual rental yield over 10 years of 56%
✓ Invest from $30,950

Defendants later claimed in the same flyer that these projected returns were based on "pessimistic" assumptions.

31.     In flyers for the Montana project, NDD touted the purported "success" of their first project (Watford West) and claimed that the "Investment Potential" of the project could yield "39% in one year." NDD claimed the investment would "provide long term passive income." NDD also told investors in flyers that the Montana project would be completed by April 2014.

32.     Similarly, in flyers for the Watford East project, NDD touted their "significant success in 2013" and represented that investors could receive "up to 34% net in year one." NDD claimed the project would provide "investors with credible and consistent rental income for the long term." NDD also told investors in flyers that all necessary permits to build the project

"will be granted." In emails to investors, NDD stated that a "conservative" completion date for the project was November 2014.

33. In the Watford East and Montana flyers, NDD claim that its projected investor returns were based on "very realistic" assumptions that the man camps would have 90% occupancy and charge approximately $140 per night.

34. Finally, in flyers for the Transhudson Hotel project, NDD promised not only attractive and "assured" returns but also promised to buy back investors' units after three years at 110% of the original purchase price, claiming that it had a "large asset base" from which to buy back the units. Again touting its "significant success in 2013," NDD stated the project would be "operational in summer 2015."

### NDD's Projects Are Delayed, Unprofitable, or Non-Existent

35. Far from examples of "success," NDD's projects range from disappointing and underperforming to non-existent. By at least the fall of 2013, Defendants knew that the Watford West project was suffering delays in construction and was significantly less profitable than expected. The Watford West project is still only partially operational. The Montana project has some units on-site but is not operational and has none of the promised amenities, such as food or laundry. The Transhudson project is in its initial stages – no units are on site or being manufactured. Finally, the Watford East project has not even started – there are no ground works, no units being manufactured, and no local government approval for the projects. In fact, local authorities have twice denied approval for the Watford East project, most recently in December 2014.

36. Despite the lack of progress and the substantial additional work required to bring the projects to completion, NDD had, as of February 2015, less than $100,000 in its operating

account, the account to which escrowed investor funds are transferred. NDD also owes various project vendors and contractors several hundred thousand dollars. Due to the non-payment of such vendors, the project properties are subject to construction liens.

37. The one project that is partially operational has performed poorly. Watford West has been beset by multiple project delays, cost overruns, and mismanagement. These problems have directly impacted the performance of the project. Occupancy rates for the operational portion of the project have been below what was provided investors. Likewise, the rates achieved have been below what was represented to investors. For example, during June 2014, Watford West was only 23% occupied and charged an average daily rate of $76 per night. In August 2014, occupancy was still low, at 30%, and with an average daily rate of $80 per night.

38. Although learning of significant delays and other problems by the fall of 2013, Defendants continued to represent in the marketing materials for the Montana, Watford East, and Transhudson projects that these projects would generate substantial annual returns in the first year of the investment. NDD, Gavin and Hogan each knew, or were reckless in not knowing, however, that NDD had experienced losses on NDD's only previous project, Watford West. Given Defendants' actual experience with Watford West, Defendants claims of significant returns for the Montana, Watford East, and Transhudson projects were unreasonable.

39. At the time Defendants represented in the marketing materials for the Montana, Watford East, and Transhudson projects that the projects would be completed by April 2014, November 2014, and Summer 2015, respectively, NDD, Gavin and Hogan each knew, or were reckless in not knowing, that NDD's only previous project, Watford West, was significantly delayed and not fully operational. Given Defendants' actual experience with Watford West, Defendants could not reasonably make a claim of the completion date for the later projects.

*Defendants Misappropriated Investor Funds.*

40.     As stated above, investors deposit their funds into an escrow account in the United States.  Investor funds are then transferred to NDD's main operating bank account, which is in a North Dakota bank.  Gavin and Hogan controlled this operating account and all other NDD bank accounts and therefore had access to and control over all of the investor funds.  NDD had no internal controls over Hogan's and Gavin's use of investor funds and until recently NDD's own accountants were not permitted to view activity in the NDD operating account. NDD accounting records are incomplete and the company has not tracked project expenses.

41.     NDD received approximately $62 million from investors into the main U.S. operating account controlled by Gavin and Hogan, and less than $100,000 was left in the account in February 2015 despite the lack of progress on NDD's projects. Rather than use investor funds on the man-camp projects, Defendants have misappropriated investor funds by spending it on unrelated projects for Hogan's and Gavin's benefit.

42.     Defendants used $1.9 million of investor funds from its main operating account to finance an oil and gas project in the name of Augusta Exploration, LLC, of which NDD is a member.  Defendants Hogan and Gavin authorized this misuse of funds.

43.     Beginning in February, 2013, Defendants used at least $5.5 million of investor funds from its main operating account to engage in several real estate transactions in the U.S. unrelated to any investor project, including:

- $1.65 million for the purchase of approximately 19 acres of land near Williston, North Dakota in the name of NDD Holdings 1 LLC.

- $1.395 million for the purchase of approximately 2.3 acres of land in Williston, North Dakota in the name of NDD Holdings 1 LLC.

13

- $1.19 million in connection with a lease-to-own real estate transaction in Trenton, North Dakota. In connection with this transaction, Defendants made certain additional payments of at least $250,000 through Great American Lodge, LLC, an entity under Hogan and Gavin's control.

- $686,000 for the purchase of land for a single-family residential development called Horizon Ridge in the name of NDD Holdings 2 LLC.

- $500,000 for the purchase of real estate and inventory in Central City, Nebraska in the name of NDD Modular, LLC

Defendants Hogan and Gavin are the beneficial owners of these projects and authorized this misuse of funds.

44.     Defendants also used $500,000 to fund an engineering company, Ames Engineering & Development Services, LLC.

45.     Defendants also misappropriated over $1.3 million for their direct personal benefit. Hogan transferred over $1 million from the NDD operating account to his personal account in the United States and transferred $350,000 from NDD's operating account to a bank account in Malaysia for Gavin's benefit.

46.     In addition, Defendants have spent at least $2.2 million of investor funds on items characterized by NDD as administrative overhead, including over $1.97 million transferred from NDD's U.S. operating account into bank accounts in the United Kingdom in the name of NDD UK. These funds were used, among other things, to provide additional compensation to Gavin and Hogan and pay commissions to NDD employees for raising money for NDD's projects. Hogan also spent almost $250,000 from the NDD operating account on meals, alcohol,

14

entertainment, and other expenses while working in the United States, even though inadequate accounting records exist to substantiate the business purpose of these amounts.

47.     Defendants never disclosed to any investor that investor funds would be diverted to fund other projects beneficially owned by Gavin and Hogan. Such information would have been material to investors.

48.     After early 2014, when Defendants represented in the offering materials that NDD would provide a guaranteed and/or variable returns, NDD, Gavin and Hogan each knew, or were reckless in not knowing, that the projects would not or did not generate sufficient investment return to pay investors and that Defendants had, in fact, misappropriated investor funds.

### *Defendants Paid Over $10 Million in Undisclosed Commissions.*

49.     Defendants used agents to procure investor funds for their scheme. NDD provided agents with marketing materials for use in soliciting investors. NDD would pay agents a minimum of 10 percent, and depending on the amount of money raised by the agent, up to 20 percent. NDD would pay the agents in stages, as funds were disbursed from escrow to NDD. Over the course of their scheme, NDD paid over $10.3 million to agents, or approximately 16.5 percent of the total investor proceeds received. Defendants did not disclose to investors in the offering materials or otherwise that it paid commissions, nor did Defendants instruct agents to disclose commissions to investors. Disclosure of the payment of Commissions from investors funds would have been material to investors.

### *Defendants Made Ponzi-Like Payments to Early Stage Investors*

50.     The Watford West project has been operating at a loss. As such, the Watford West project has not generated the profits necessary to pay the promised, "guaranteed" returns to investors. To make up that shortfall, NDD has transferred money from the primary NDD

15

operating account, containing money from later stage investors, to accounts in the name of North

Dakota Developments Property Management LLC in order to pay returns to early stage

investors. Upon information and belief, over $2.4 million in funds from later stage investors

have been used by NDD to pay returns to investors in the Watford West project. However, now

that NDD has run out of money and Watford West is unprofitable, NDD is no longer paying

Watford West investors their "guaranteed" returns.

51. After early 2014, when Defendants represented that NDD would provide

guaranteed returns, NDD, Gavin, and Hogan each knew, or were reckless in not knowing, that

the projects would not or did not generate sufficient profits to pay investors and that Defendants

had, in fact, made Ponzi-like payments to early stage investors.

### *Defendants Misappropriated Money From Escrow.*

52. Defendants claimed in flyers that their investment process was "transparent" and

"secure" and that NDD would only receive funds from escrow upon meeting certain milestones.

The use of escrow, maintained by a United States law firm in a United States bank account, was

touted by NDD as an added layer of protection for investors.

53. NDD told investors that their second installment of the purchase price would only

be released to NDD when investors' units were "ready to ship from the factory." NDD also told

investors that the final portion of the purchase price would only be released to NDD when the

unit was placed on the site and "ready for occupation."

54. Contrary to NDD's representations, Defendants caused second and third stage

disbursements from escrow even though units were not "ready to ship" or "ready for

occupation." For example, several second stage payments were made for the Montana project

even though the units were not ready to ship from the factory. Further, several third stage

16

payments have been made for the Watford West project even though the units do not have electricity and do not have a certificate of occupancy from the local authorities and, therefore, are not "ready for occupation." Defendants caused the early disbursements from escrow by making false statements to the escrow agent regarding project status. The amount prematurely released from escrow appears to exceed $1 million.

55.     At the time Defendants represented in the offering materials that NDD would only receive funds from escrow upon meeting certain milestones, NDD, Gavin, and Hogan each knew, or were reckless in not knowing, that NDD either planned to or, in fact, had misappropriated escrow funds.

### Defendants Perpetuated the Fraud Through Lulling Tactics.

56.     As Defendants' scheme began to unravel, Defendants engaged in conduct designed to "lull" investors; tempering complaints and reducing requests for refunds. First, Defendants purported to make "rebate" payments to certain investors to compensate them for delays in the projects. Second, Defendants offered to transfer investors in later, un-started projects such as Watford East into a different project referred to as the Bakken Base Camp ("BBC") which is an operational man in North Dakota owned by a third party. NDD, however, does not own the BBC and the occupancy and average daily rates of the BBC are substantial lower than those touted in the original projects sold to investors.

### Gavin and Hogan Made Material Misrepresentations and Omissions

57.     As the owners, managing members, and senior-most officers of NDD, Gavin and Hogan exercised ultimate authority over the content and distribution of the investment documents used by NDD, including the marketing flyers. Gavin and Hogan authored, reviewed, authorized, and/or distributed the various offering materials transmitted directly to investors or

17

indirectly to investors through agents. In those documents, Defendants made material misrepresentations and omissions regarding the use of investor funds, the payment of commissions, and the return on the investment, directly to investors and indirectly to investors through agents they provided marketing materials and paid commissions.

58.     Hogan personally participated in in-person meetings in the United States with 15-20 investors, potential investors, and/or agents. Hogan also provided sales training to NDD's agents. Furthermore, Hogan participated in conference calls with investors about NDD projects. Gavin personally participated in multiple in-person investor seminars for NDD. Gavin also communicated directly with an NDD sales agent in the United States.

59.     Gavin and Hogan knew, or were reckless in not knowing, that NDD's marketing materials were false and misleading. Gavin and Hogan controlled NDD's operations and its bank accounts. Gavin and Hogan knew they had misappropriated investor funds and made Ponzi-like payments, and that Watford West was delayed and unprofitable.

### *Gavin and Hogan Engaged in a Scheme to Defraud.*

60.     Gavin and Hogan engaged in deceptive acts and a course of business that operated as a fraud. Gavin and Hogan engaged in the following acts in furtherance of the fraudulent scheme:

- Gavin and Hogan misappropriated investor funds for personal use;

- Gavin and Hogan cause NDD to make Ponzi-like payments to early stage investors; and

- Gavin and Hogan caused money to be taken from escrow early;

**_NDD's Offerings Were Securities and Were Not Registered with the SEC or Exempt_**
**_From Registration._**

61.     The definition of a "security" under Section 2(a)(1) of the Securities Act [15

U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 77c(a)(10)] includes

"any. . . participation in any profit-sharing agreement [or] . . . investment contract."

62.     The NDD projects are securities under the Securities Act and the Exchange Act.

The projects are "investment contracts" as defined by Section 2(a)(1) of the Securities Act and

Section 3(a)(10) of the Exchange Act.  The projects are also investment contracts because

investors made an investment of money in a common enterprise, with an expectation of profits to

be derived solely from the efforts of NDD.  NDD markets the projects as "investments."

63.     NDD's offering has raised approximately $62 million from hundreds of investors,

including over $10 million from over 100 investors in several states.

64.     Individual investors sent money to NDD with the expectation of sharing in profits

from NDD's real estate development activities.  Consistent with the management agreements

signed by investors, investors expected that NDD would pool investor funds to develop the

projects, manage investor units collectively once the project was operational, and distribute

profits based on the project's overall success.  NDD also promised investors returns "regardless

of the actual rental income received, whether higher or lower than the actual income derived

from the" unit.

65.     The investment contract was structured by NDD to ensure that no investor choose

to manage their own unit.  NDD "strongly" recommended investors selected NDD to manage the

unit and required that that investors pay a punitive "lease" payment for renting the ground under

their unit, a payment that was waived if an investor agreed to have NDD manage the unit.

Furthermore, NDD's promise of "guaranteed" returns was only available if NDD managed the unit. Every investor selected NDD to manage their unit.

66.     Investors expected the profits to come solely from NDD's real estate development and management activities. The investors were not required or expected to do anything besides provide funds in order to receive their returns. NDD described investors' roles as "passive" in marketing materials.

67.     Defendants offered and sold securities to investors in the United States using the means or instruments of interstate commerce including but not limited to telephones, the Internet, and the mails.

68.     NDD securities were offered and sold to unaccredited and unsophisticated investors in the United States, and Defendants did not have reasonable basis to believe that all NDD investors in the United States were accredited and sophisticated.

69.     NDD failed to provide U.S. investors with the information required under Rule 502(b) of Regulation D [17 C.F.R. § 230.502(b)], including an audited balance sheet.

70.     NDD did not have a pre-existing substantive relationship with each U.S. investor, and, therefore, engaged in a general solicitation.

71.     NDD's offering has never been registered with the SEC, or any state securities authority.

**FIRST CLAIM FOR RELIEF**
**Fraud: Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R.**
**§ 240.10b-5**
**(All Defendants)**

72.     The preceding factual allegations are hereby realleged and incorporated by reference.

73.    By engaging in the conduct described above Defendants directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

74.    By reason of the foregoing, Defendants each violated, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SECOND CLAIM FOR RELIEF
**Fraud:  Control Person Liability Under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for NDD's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. §§ 78j(b) and 17 C.F.R. § 240.10b-5]
(Gavin and Hogan, Alternatively)**

75.    The preceding factual allegations are hereby realleged and incorporated by reference.

76.    NDD, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

77.    Gavin, as managing member, CEO, and majority owner of NDD, and Hogan, as managing member, COO, and owner of NDD, exercised control over the management, general operations, and policies of NDD, as well as the specific activities upon which NDD's violations

21

are based.

78.     By reason of the foregoing, Gavin and Hogan are each liable as control persons under Section 20(a) of the Exchange Act for NDD's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**THIRD CLAIM FOR RELIEF**
**Fraud:  Aiding and Abetting NDD's Violations of Section 10(b) of the Exchange Act and Rnle 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Gavin and Hogan, Alternatively)**

79.     The preceding factual allegations are hereby realleged and incorporated by reference.

80.     NDD, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security,: employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

81.     By engaging in the conduct described above, Gavin and Hogan each aided and abetted the fraud violations of NDD, in that they knowingly or recklessly provided substantial assistance to NDD in committing these violations.

82.     By reason of the foregoing, Gavin and Hogan have each aided and abetted and, unless restrained and enjoined, will continue to aid and abet, NDD's violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

**FOURTH CLAIM FOR RELIEF**
**Fraud in the Offer or Sale of Securities in Violation of Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**(All Defendants)**

83.    The preceding factual allegations are hereby realleged and incorporated by reference.

84.    By engaging in the conduct described above, NDD, Gavin, and Hogan have, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme or artifice to defraud with scienter; obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities..

85.    By reason of the foregoing, NDD, Gavin, and Hogan violated and, unless restrained and enjoined, will continue to violate Section 17(a)(1) of the Securities Act.

**FIFTH CLAIM FOR RELIEF**
**Fraud:  Aiding and Abetting NDD's Violations of Section 17(a) of the Securities Act [15**
**U.S.C. sec. 77q(a)]**
**(Gavin and Hogan, Alternatively)**

86.    The preceding factual allegations are hereby realleged and incorporated by reference.

87.    NDD, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme or artifice to defraud with scienter; obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made,

23

not misleading; or engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

88.     By engaging in the conduct described above, Gavin and Hogan each aided and abetted the offering fraud violations of NDD, in that they knowingly or recklessly provided substantial assistance to NDD in committing these violations.

89.     By reason of the foregoing, Gavin and Hogan, and each of them, have aided and abetted and, unless restrained and enjoined, will continue to aid and abet, NDD's violations of Section 17(a) of the Securities Act.

## SIXTH CLAIM FOR RELIEF
### Sale of Unregistered Securities Violations of Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a), 77e(c)]
### (All Defendants)

90.     The preceding factual allegations are re-alleged and incorporated herein by reference.

91.     Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce or by use of the mails, offered and sold securities or carried or caused such securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale, when no registration statement had been filed or was in effect as to such securities.

92.     By reason of the foregoing, Defendants violated, and unless enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Securities and Exchange Commission respectfully requests that the Court:

## I.

Find that each of the Defendants committed the violations alleged in this Complaint;

## II.

Enter preliminary and permanent injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily and permanently restraining and enjoining each of the Defendants from violating, directly or indirectly, the laws and rules alleged in this Complaint;

## III.

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre- and post-judgment interest, derived from the improper conduct set forth in this Complaint;

## IV.

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court, plus post-judgment interest;

## V.

Order such other relief as this Court may deem just or appropriate.

Respectfully submitted May 5, 2015.


s/Polly A. Atkinson
Polly A. Atkinson
Attorney for Plaintiff
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1000
Fax No. (303) 297-3529
atkinsonp@sec.gov

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | North Dakota Developments, LLC, Robert Gavin, and Daniel Hogan, Defendants and North Dakota Developments Property Management, LLC, Great American Lodge LLC et al. Relief Defendants. |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Williams, North Dakota
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Polly A. Atkinson, U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700, Denver CO 80294-1961
303-844-1000

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 77t(d), 15 U.S.C. § 78u(d); 17 C.F.R. § 240.10b-5
Brief description of cause:
Securities Fraud

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
May 5, 2015

SIGNATURE OF ATTORNEY OF RECORD
s/ Polly A. Atkinson

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# OPPENHEIMER

OPPENHEIMER WOLFF & DONNELLY LLP

Campbell Mithun Tower - Suite 2000
222 South Ninth Street
Minneapolis, MN 55402
www.Oppenheimer.com

Direct:    (612) 607-7247
Main:      (612) 607-7000
Fax:       (612) 607-7100
E-Mail:    RLeier@oppenheimer.com

June 10, 2015

**RECEIVED**

**JUN 1 ' 2015**

**CLERK
U.S. DISTRICT COURT
OMAHA**

## VIA FEDERAL EXPRESS

Clerk of Court
United States District Court, District of Nebraska
Roman L. Hruska Federal Courthouse
111 South 18th Plaza
Suite 1152
Omaha, NE 68102

Re:    Filing of Notice under 28 U.S.C. § 754 for proceedings in the
       United States District Court for the District of North Dakota
       *United States Securities and Exchange Commission v. North Dakota
       Developments, LLC, et al.*
       Civil No. 4:15-cv-00053 Honorable Daniel L. Hovland presiding

Dear Clerk of Court:

Enclosed for filing please find a copy of the Order Granting Plaintiff's Motion for
Preliminary Injunction and Appointment of Receiver, Asset Freeze, and Other Equitable Relief
recently entered by the Honorable Daniel L. Hovland, United States District Judge for the
District of North Dakota (*United States Securities and Exchange Commission v. North Dakota
Developments, LLC, et al.*, Civil Case No. 4:15-cv-00053 (DLH/CSM)), in which the Court
appointed Gary Hansen as receiver for Defendant North Dakota Developments, LLC and the
Relief Defendants identified in the case caption.

The Receiver is filing this Order pursuant to 28 U.S.C. § 754, which provides that the
Receiver shall ". . . file copies of the complaint and such order of appointment [of the receiver]
in the district court for each district in which property is located."

Enclosed for filing are the following documents:

1.    Copy of the Complaint; and



OPPENHEIMER

OPPENHEIMER WOLFF & DONNELLY LLP

Clerk of Court
DATE: June 10, 2015
PAGE: 2

> 2. Copy of Order Granting Plaintiff's Motion for Preliminary Injunction and Appointment of Receiver, Asset Freeze, and Other Equitable Relief.

I included two copies of each of the above-listed documents and a self-addressed stamped envelope. Please return a file-stamped set of the above-listed documents in the self-addressed stamped envelope.

Also enclosed is a check addressed to the Clerk of the U.S. District Court in the amount of $46.00 for the Miscellaneous filing fee.

If you should have any questions, please do not hesitate to call me.

Sincerely,

Ranelle Leier

RL:CST
Enclosures

cc:   Gary Hansen (via e-mail w/o encl.)

Align top of FedEx Express® shipping label here.



From:  (612) 607-7247                     Origin ID: GPZA
RANELLE LEIER
OPPENHEIMER WOLFF & DONNELLY LLP
222 South Ninth Street
Suite 2000 Campbell Mithun Tower
Minneapolis, MN 55402

SHIP TO: (402) 661-7350        BILL SENDER
Clerk of Court
Roman L. Hruska Federal Courthouse
111 South 18th Plaza
Suite 1152
OMAHA, NE 68102

Ship Date: 10JUN15
ActWgt: 2.0 LB
CAD: 4037350/NET3910

Delivery Address Bar Code

Ref # 11817-26
Invoice #
PO #
Dept #

THU - 11 JUN AA
STANDARD OVERNIGHT

TRK# 7738 0508 9900
FZ91

XX AIAA

68102
NE-US
OMA





Express



# Extremely Urgent

**For FedEx Express® Shipments Only**

Contents should be compatible with the container and packed securely. For shipping terms and conditions and our limits of liability, refer to the applicable FedEx Express shipping document, the current FedEx Service Guide, or conditions of carriage.

For more information on FedEx Express services, solutions, and shipping locations, go to **fedex.com**, or contact your nearest FedEx location.

© 2013 FedEx 156374 REV 9/13



**HDPE**

See how FedEx connects the world in responsible and resourceful ways at **earthsmart.fedex.com**. Join our efforts by recycling this FedEx pak. Recycling options may be limited and vary by location.

